# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **No. 18-112** |
| **WILLIAM B. HUNGERFORD, JR. ET AL.** | **SECTION I** |

## ORDER & REASONS

Before the Court is defendants William B. Hungerford and Timothy O. Milbrath's (together, "defendants") motion[1] to dismiss the superseding indictment[2] based on violations of their constitutional right to due process under the Fifth and Fourteenth Amendments and their constitutional right to counsel under the Sixth Amendment. Specifically, defendants allege a breach of client confidentiality that has infected the superseding indictment and prejudiced them. The government opposes the motion.[3] For the foregoing reasons, the motion is denied.

## I.

On or about May 5, 2006, defendants formed NobleOutReach, LLC ("NOR").[4] Defendants allege that the purpose of NOR was to "resurrect the dormant EB-5 foreign investment program in New Orleans."[5] The EB-5 program allows foreign nationals who invest a certain amount of money in a new or troubled American

---

[1] R. Doc. No. 68.
[2] R. Doc. No. 39.
[3] R. Doc. No. 74.
[4] R. Doc. No. 39, at 3 ¶ 4.
[5] R. Doc. No. 68-1, at 6.

business to obtain a legal permanent residency in the United States if, after two years, the investment creates at least ten full-time employment positions for qualifying United States workers.[6] Generally, the qualifying capital contribution for participation in the EB-5 program is $1,000,000.00, but individuals could qualify by investing $500,000.00 in a "targeted employment area" ("TEA").[7]

The EB-5 program is administered by United States Citizenship and Immigration Services ("USCIS"). "Immigrant investors could qualify for EB-5 visas by investing though Regional Centers designated by USCIS."[8] Defendants allegedly established NOR to operate the New Orleans Regional Center and NobleReach-NOLA, LLC to act as the principal agent of the New Orleans Regional Center.[9]

Defendants allegedly created NobleRealEstateFund, LP (the "Fund"), the entity in which the foreign investors would invest their capital contributions and become limited partners.[10] Defendants allege that attorney Rana Jazayerli ("Jazayerli") assisted them in drafting the documents that governed the Fund and the relationship between defendants, NOR, and other related entities.[11] The superseding indictment alleges that, according to the Fund's operating documents,

---

[6] R. Doc. No. 39, at 2; R. Doc. No. 68-1, at 6; R. Doc. No. 74, at 2.
[7] R. Doc. No. 39, at 2 ¶ 2; *see also* R. Doc. No. 68-1, n.38.
[8] R. Doc. No. 39, at 2–3 ¶ 3. "USCIS designated 'regional investment center[s] in the United States for the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.' 8 U.S.C. § 1153(b)(5)(A)(ii). Regional Centers had to promote economic growth within a designated geographic area." *Id.*
[9] R. Doc. No. 39, at 3 ¶ 6; *see also* R. Doc. No. 68-1, at 6.
[10] R. Doc. No. 39, at 4 ¶ 9; R. Doc. No. 68-1, at 6; R. Doc. No. 74, at 3.
[11] R. Doc. No. 68-1, at 7.

"the purpose of the Fund was to create financial returns for investors, assist investors in meeting the criteria for the EB-5 program, and to contribute to the 'reconstruction and rejuvenation of New Orleans.'"[12] The superseding indictment also alleges that operating documents stated that the Fund would conduct its business in the New Orleans TEA, permitting the investors to contribute a minimum of $500,000.00.[13]

Defendants allege that Jazayerli also worked directly with the foreign investors to assist them with certifications, USCIS filings, and responding to USCIS's requests for information.[14] Defendants allege that Jazayerli and other attorneys were "intimately involved in all aspects of the deliberation and creation of NOR and the EB-5 Program."[15] Thus, they allege, Jazayerli and other NOR attorneys possessed defendants' privileged and confidential information.[16]

Defendants allege that in March 2011, USCIS began denying the investors' I-526 petitions for conditional residency.[17] Defendants allegedly looked to Jazayerli for guidance as to why the petitions were being denied and how such issues could be resolved.[18] The issues were seemingly never resolved, however, because in late 2011,

---

[12] R. Doc. No. 39, at 4 ¶ 11.
[13] R. Doc. No. 39, at 4 ¶ 11–12.
[14] R. Doc. No. 68-1, at 8–9.
[15] *Id.* at 7.
[16] *Id.*
[17] R. Doc. No. 68-1, at 10. The superseding indictment explains that USCIS required investors to complete an "Immigrant Petition by an Alien Entrepreneur known as an I-526 to demonstrate, among other things, that they were in the process of investing, or had already invested, the required amount of capital in a suitable EB-5 project. . . . Once USCIS approved an investor's I-526 petition, the $500,000.00 investment was released from escrow." R. Doc. No. 39, at 5 ¶ 14.
[18] R. Doc. No. 68-1, at 10.

defendants allege that NOR informed its investors of the "USCIS stalemate" and that NOR might have to liquidate the Fund.[19] The government alleges that all of the investors' I-829 petitions were denied as well.[20] According to defendants, that was "the point at which the interests of [d]efendants and NOR began to diverge from those of the investors."[21]

In January 2012, Jazayerli announced that she had joined the firm of Dilworth Paxon, LLP ("Dilworth Paxon").[22] A few months later, on March 15, 2012, Dilworth Paxon, on behalf of a group of "dissatisfied Fund investors" (the "plaintiffs"), filed a derivative action against defendants, NOR, and their other entities in the Eastern District of Louisiana, which was allotted to U.S. District Judge Susie Morgan.[23] The law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("Baker Donelson") served as local counsel on behalf of the plaintiffs.[24]

---

[19] *Id.* at 11.

[20] R. Doc. No. 74, at 4. Defendants explain that an "I-829 Petition is the request by an EB-5 investor submitted to USCIS seeking removal of conditions on their visa. This takes place after the end of two years demonstrating that the investment has yielded the requisite number of jobs required under the program." R. Doc. No. 68-1, at 10 n.34; *see also* R. Doc. No. 39, at 6 ¶ 15 ("USCIS used the I-829 petition to determine whether the investor qualified for permanent resident status.").

[21] R. Doc. No. 68-1, at 11.

[22] *Id.*; R. Doc. No. 74, at 4. When defendants first began working with Jazayerli, she was an immigration attorney at the Kiblan Law Firm, PC, but on or about February 2008, Jazayerli started her own law firm. R. Doc. No. 68-9, at 2–3 (Affidavit of William B. Hungerford, Jr.).

[23] R. Doc. No. 68-1, at 11; R. Doc. No. 74, at 4–5. Plaintiffs were limited partners in the Fund and filed the civil lawsuit "by way of derivative action for the benefit of the Fund against the defendants . . . for gross mismanagement, breach of fiduciary duty, intentional interference with contract, conversion of Fund assets, and unjust enrichment." R. Doc. No. 74-5, at 2 (Verified Complaint).

[24] R. Doc. No. 68-1, at 11–12; *see also* R. Doc. No. 74, at 5.

On September 14, 2012, after alerting the plaintiffs that Jazayerli and Dilworth Paxon had a conflict of interest in the civil lawsuit, defendants filed a motion to disqualify plaintiffs' counsel.[25]  On May 30, 2013, Judge Morgan granted the motion pursuant to Rules 1.9 and 1.10 of the Professional Rules of Conduct of the Louisiana State Bar, finding that Jazayerli and defendants had had an attorney-client relationship, that her representation of the plaintiffs in the civil matter created a conflict of interest, and that the conflict must be imputed to Dilworth Paxon and Baker Donelson.[26]

Defendants allege that, while the motion to disqualify was pending and after Judge Morgan ruled on the motion, the government engaged in improper meetings and communications with defendants' former attorneys.  Defendants allege that on or around February 15, 2013, prior to Judge Morgan's decision on the motion to disqualify, James J. Rodgers of Dilworth Paxon ("Rodgers") voluntarily contacted and met with the FBI to be interviewed about NOR and defendants' involvement with the EB-5 program.[27]  Rodgers described, among other things, defendants' alleged mismanagement of the EB-5 program, NOR, and other entities.[28]  Defendants specifically assert that Rodgers discussed "claims that later showed up in the

---

[25] R. Doc. No. 68-1, at 12–13; R. Doc. No. 74, at 5.
[26] R. Doc. No. 68-1, at 12–13; R. Doc. No. 68-2; R. Doc. No. 74, at 5.
[27] R. Doc. No. 68-1, at 15; R. Doc. No. 68-5 (Rodgers' FBI 302 form). Baker Donelson attorneys Roy Cheatwood and Kent Lambert were also at the meeting, as well as Assistant U.S. Attorneys Matthew Chester and Emily Greenfield. R. Doc. No. 68-5, at 1. *See also* R. Doc. No. 74, at 13.
[28] R. Doc. No. 68-5.

Government's Indictment—information Jazayerli would have been privy to as NOR's lawyer."[29]

The government interviewed attorney Michael Fantaci ("Fantaci") in August 2015.[30]  Fantaci was a member of the Fund Advisory Board (the "FAB"),[31] and defendants allege that he only served on the board in his capacity as an attorney in order to provide legal advice to the directors.[32]  The government agent and Fantaci agreed "to check the bounds of attorney/client privileged information," and Fantaci said he was "open" to another interview with his "boss"[33] and another attorney knowledgeable about attorney-client privilege.

The government contacted Fantaci again in May 2018.  On May 18, 2018, the government subpoenaed Fantaci to appear before the grand jury and to produce documents.[34]  Fantaci was subpoenaed in his capacity as a member of the FAB, and the government requested any and all original documents of FAB meeting minutes.[35]

---

[29] R. Doc. No. 68-1, at 16.

[30] R. Doc. No. 74-9. Fantaci was an attorney at the firm Leblanc Butler, LLC, which was retained by NOR as counsel in 2006. R. Doc. No. 68-1, at 17; R. Doc. No. 68-22 (engagement letter).

[31] R. Doc. No. 68-1, at 18; R. Doc. No. 74, at 8. According to Fantaci, the FAB was an "advisory component which was built into the partnership," the FAB consisted of three members—Fantaci and defendants, and he was not paid to be on the FAB. R. Doc. No. 74-10 (Fantaci FBI 302 form).

[32] R. Doc. No. 68-1, at 18. At the August 2015 meeting, Fantaci explained that he no longer did any work for defendants; that he had recently removed himself as the registered agent for defendants' LLCs; and that he and his law partner had discussed distancing themselves from defendants when NOR received "bad press."

[33] R. Doc. No. 74-9. The FBI 302 reflects that Fantaci was referencing Patricia Butler, a partner at Fantaci's law firm. *Id.*; *see also* R. Doc. No. 68-22.

[34] R. Doc. No. 74-11.

[35] *Id.* at 3.

Further, the subpoena specifically stated that it was not requesting any privileged attorney-client communications.[36]

The government then interviewed Fantaci on or about May 24, 2018.[37]  At that interview, the FBI agents again warned Fantaci not to provide any privileged information, and he was told that he was being interviewed only as a member of the FAB and not as defendants' attorney.[38]

Defendants also allege that the government obtained privileged and confidential information from Maurice Berez ("Berez"), former USCIS EB-5 program manager and advisor to NOR.[39]  They allege that an email from Berez's attorney shows that Berez provided NOR's privileged and confidential documents to the government.[40]  In the email to a government agent, Berez's attorney explained that he was providing a thumb drive of redacted copies of files that Berez had already turned over and that he "erred on the side of privilege" to remove any questionable files.[41]

---

[36] *Id.*
[37] R. Doc. No. 68-1, at 17–18; R. Doc. No. 74, at 8.
[38] R. Doc. No. 68-1, at 18; R. Doc. Nos. 68-7, 74-10. At the May 24, 2018 meeting, Fantaci stated that he only participated in one FAB meeting in or around September 18, 2008; that he is not aware of any other FAB meetings; that he stopped having contact with defendants in late 2012 or early 2013; that he forgot he was a member of the FAB until he was named in the civil complaint; and that in or around 2015, he resigned as a member of the FAB and had himself removed as the registered agent for defendants' companies. R. Doc. Nos. 68-7, 74-10.
[39] R. Doc. No. 68-1, at 19.
[40] *Id.*; 19; R. Doc. No. 68-26.
[41] R. Doc. No. 68-26.

Defendants further allege that the government pursued attorney interviews after defendants were indicted. Specifically, they assert that the government met with the attorney for Elizabeth Milbrath, defendant Milbrath's wife, to encourage Mrs. Milbrath to communicate to her husband that he could get a better plea deal if he testified against defendant Hungerford.[42] Mrs. Milbrath's attorney stated that the government showed him an email between Mrs. Milbrath and Hungerford that appeared to be a privileged communication.[43]

Finally, defendants allege that the government failed to establish a taint team to review any privileged materials before they were viewed by the prosecuting team, in violation of the U.S. Attorney's Justice Manual.[44]

## II.

Courts may dismiss indictments "based on constitutional grounds or on the court's inherent supervisory power." *United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir. 1985). "The supervisory powers of the district court allow it to impose the extreme sanction of dismissal of an indictment with prejudice only in extreme circumstances." *United States v. Fulmer*, 722 F.2d 1192, 1195 (5th Cir. 1983) (citing *United States v. Campagnulo*, 592 F.2d 852, 865 (5th Cir. 1979)). "[A] district court

---

[42] R. Doc. No. 68-1, at 20–21. Defendants assert that Mrs. Milbrath is an attorney and that she advised defendants and NOR in connection with the EB-5 program. *Id.* at 20. Defendants do not allege that the government met with Mrs. Milbrath directly.
[43] R. Doc. No. 68-1, at 21; R. Doc. No. 68-27.
[44] R. Doc. No. 68-1, at 21 (citing U.S. DEP'T OF JUSTICE, JUSTICE MANUAL, 9-13.420 (2018)). Defendants argue that while the provision requiring the government to establish a taint team generally applies when the government is conducting a search of an attorney's office or when the attorney is the subject of the search, the same procedure should apply here.

may dismiss an indictment with prejudice only where it has been shown that governmental misconduct or gross negligence in prosecuting the case actually prejudiced the defendant." *Fulmer*, 722 F.2d at 1195 (citations omitted); *see also United States v. Swenson*, 894 F.3d 677, 684 (5th Cir. 2018).

"Government misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment." *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) (citing *United States v. Russell*, 411 U.S. 423, 431–32 (1973)). Furthermore, "government interference with a defendant's relationship with his attorney may render that attorney's assistance ineffective and thus violate the Sixth Amendment." *United States v. Marshank*, 777 F. Supp. 1507, 1518 (N.D. Cal. 1991) (citing *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980)). "[M]ere error or oversight is neither gross negligence nor intentional misconduct." *Swenson*, 894 F.3d at 684 (quoting *Fulmer*, 722 F.2d at 1195).

> Dismissal of an indictment with prejudice is a rare result because, even in the face of prosecutorial misconduct, there is a "public interest in having indictments prosecuted." [*United States v. Welborn*, 849 F.2d 980, 985 (5th Cir. 1988)]. That said, [the Fifth Circuit] has expressly declined to "foreclose the possibility that governmental ineptitude and carelessness could be so abhorrent as to warrant dismissal with prejudice." *Fulmer*, 722 F.2d at 1196.

*Id.* at 684–85.

"[A] defendant who asserts the defense of outrageous government conduct has an extremely high burden of proof." *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997); *see also United States v. Voigt*, 89 F.3d 1050, 1070 (3d Cir. 1996)

(explaining that the defendant "bear[s] both the burden of production and persuasion on his outrageousness claim"). "Whether outrageous government misconduct exists turns on the totality of the circumstances." *Marshank*, 777 F. Supp. at 1523 (citing *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981)). "[E]very case must be resolved on its facts." *Id.* (citing *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir.) *vacated on other grounds, United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986)).

## III.

Defendants argue that the government's actions—interviewing defendants' former attorneys and advisors and allegedly receiving defendants' privileged and confidential information—rises to the level of outrageous government conduct, thereby violating their constitution rights. The Court disagrees and finds that defendants have not met their burden of showing outrageous government conduct sufficient to warrant dismissal of the indictment.

## A.

To demonstrate that the government violated their right to due process under the Fifth and Fourteenth Amendments, defendants rely primarily on two cases, *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985) and *United States v. Marshank*, *supra*, wherein both courts dismissed the indictments against the defendants because of the government's intrusion into the defendants' attorney-client relationships. Neither case is persuasive.

In *Schell*, the U.S. Fourth Circuit Court of Appeals held that the district court should have dismissed the indictment as to two defendants because the defendants' former criminal defense attorney "switched sides," which was *per se* prejudicial. *Schell*, 775 F.2d at 565. Attorney David Jividen ("Jividen") represented two defendants, John Cain ("Cain") and Frieda Virginia Gallo Wilson ("Wilson"), among others, who had been issued grand jury subpoenas. *Id.* at 562. Cain informed Jividen that he would invoke his Fifth Amendment privilege, so Jividen contacted the government on Cain's behalf and Cain was released from his grand jury subpoena. *Id.* Wilson testified when the grand jury convened, and Jividen spoke with Wilson before and during a break in her testimony. *Id.* A few months later, Jividen became an Assistant U.S. Attorney and appeared before a grand jury in the same investigation and criminal matter, eliciting testimony from witnesses about his former clients. *Id.* at 563. The Fourth Circuit held that "Jividen represented Wilson and Cain with respect to the very same criminal activity which led to the indictment that he ultimately helped to prosecute and under which Wilson and Cain were convicted," and that "due process is violated when an attorney represents a client and then participates in the prosecution of that client with respect to that same matter." *Id.* at 565.

Defendants argue that the same reasoning applies here because Jazayerli represented defendants before "switching sides" and "virtually constructed the Government's case."[45] *Schell* is clearly distinguishable.

---

[45] R. Doc. No. 77, at 6–7.

Jividen, the attorney in *Schell*, switched sides in that he was the defendants' criminal defense attorney and, a short while later, a criminal prosecutor in the exact same criminal matter involving his former clients. *Id.* at 565. Jazayerli, on the other hand, advised defendants with respect to their business affairs, and her participation was limited to the civil matter that has been closed.[46] Other than defendants' speculative allegations that the government "adopted Jazayerli's betrayal whole-cloth" and based the entire indictment on "Jazayerli's civil complaint,"[47] defendants' have not alleged or demonstrated that their former attorneys participated in the prosecution beyond sitting for interviews or responding to subpoenas.[48]

In *Marshank*, the district court dismissed the indictment for outrageous government misconduct after government prosecutors "actively collaborated" with the defendant's attorney, Ronald Minkin ("Minkin"). 777 F. Supp. at 1524. Minkin had an ongoing attorney-client relationship with the defendant, and the district court held that the government "show[ed] a complete lack of respect for the constitutional rights of the defendants and Minkin's other clients and an utter disregard for the government's ethical obligations." *Id.* Furthermore, "the government colluded with Minkin to obtain an indictment against the defendant, to arrest the defendant, to

---

[46] Judge Morgan granted defendants' motion to dismiss in the civil lawsuit on July 11, 2014 and entered a judgment in favor of defendants on July 16, 2014. *Sumpter et al. v. Hungerford et al.*, No. 12-717, R. Doc. Nos. 204, 205.

[47] R. Doc. No. 68-1, at 32.

[48] The Court notes that defendants' allegations about Rodgers and other attorneys allegedly disparaging defendants to the press, R. Doc. No. 68-1, at 13 (citing R. Doc. No. 68-21), and attempting to cancel NOR's agreement with the City of New Orleans, *Id.*, at 16–17 (citing R. Doc. No. 68-6), are irrelevant to the issues relating to the present motion.

ensure that Minkin would represent the defendant despite his obvious conflict of interest, and to guarantee the defendant's cooperation with the government." *Id.*

The government's conduct in the instant matter is not remotely close to the government's misconduct in *Marshank*.[49] Defendants essentially restate the factual findings in *Marshank* as broad allegations of the government's conduct, hardly applying them to the facts of this case. Defendants argue that the government deliberately intruded on their attorney-client relationships by interviewing Rodgers, Jazayerli's colleague at Dilworth Paxon; "extract[ing] privileged information" from Berez, EB-5 program director; interviewing defendants' "then-attorney" Fantaci; requesting that defendants waive their privilege as to the documents already in the government's possession; and meeting with Mrs. Milbrath's attorney to discuss a plea deal for defendant Milbrath.[50]

Unlike the government's misconduct in *Marshank*, in which the government colluded with the defendant's criminal defense attorney who was actively representing the defendant at the time, none of the attorneys that the government contacted in the instant matter were actively representing defendants in any criminal matter or criminal investigation. In fact, Fantaci is the only attorney with whom

---

[49] In *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), the court noted that *Marshank* was the only decision that "has ordered an indictment be dismissed due to preindictment intrusion into the attorney-client relationship so pervasive and prejudicial as to be considered 'outrageous.'" *Id.* at 1066. This Court has discovered only one other case since *Voigt* and *Marshank* in which an indictment was dismissed for intrusion into the attorney-client relationship, *United States v. Sabri*, 937 F. Supp. 134 (S.D.N.Y. 1996), and *Sabri* is similarly distinguishable.
[50] R. Doc. No. 68-1, at 35.

defendants allege they had an ongoing attorney-client relationship at the time he met with the government.[51] Defendants have not demonstrated any collusion between the government and defendants' attorneys—current or former.

The Court finds *United States v. Rogers*, *supra*, to be more instructive. In *Rogers*, the defendant moved the district court to dismiss the indictment, arguing that the government interfered with the attorney-client relationship of the defendant and an attorney. 751 F.2d at 1076. Specifically, the defendant argued that an IRS agent's interview with the defendant's former attorney about an ongoing criminal investigation relating to the defendant, which resulted in an indictment five years after the initial interview, prejudiced the defendant. *Id.* The district court ruled that the government agent improperly interfered with the attorney-client relationship and it dismissed the indictment, but the U.S. Ninth Circuit Court of Appeals reversed. *Id.* at 1077–79.

> The attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer. In this case, there has not been any forced disclosure of a confidential communication in a judicial proceeding. Whether the communication between [the defendant] and his attorney [ ] is in fact privileged and, thus, whether evidence of that communication can be objected to and excluded at trial, is a matter to be resolved in the trial court if the case proceeds to trial.

---

[51] *See* R. Doc. No. 68-1, at 35 ("[T]he Government interviewed Defendants' then-attorney, Michael Fantaci."). To that end, the government attempted to protect client confidentiality and privilege both times agents met with Fantaci, ending the first interview in 2015 by agreeing to "check the bounds of attorney/client privileged information," R. Doc. No. 74-9, and again in 2018 by advising Fantaci "not to provide any information which may be privileged," R. Doc. Nos. 68-7, 74-11.

> The central question in this case is whether an agent of the Federal Government has improperly induced an attorney to breach his ethical duty of confidentiality to his client and, if so, whether that conduct was so outrageous, and resulted in such prejudice to the defendant, as to justify dismissing the indictment with prejudice.

*Id.* at 1077.

Defendants attempt to distinguish *Rogers* by arguing that the government in that case spoke with the defendant's former attorney only after the government had initiated the criminal investigation, asserting that the government in the instant matter "initiated its investigation in response to the efforts" of Rodgers and Jazayerli.[52]  Defendants' argument is not persuasive.  The fact that Rodgers approached the FBI and the government lends credence to the fact that the government did not purposefully intrude or force the disclosure of defendants' confidential communications.[53]

The government asserts that, following the meeting with Rodgers, it instituted an independent investigation that proceeded for many years.[54]  In that investigation, the government issued subpoenas to businesses that worked with NOR as well as financial institutions in custody of bank records related to NOR and its investors'

---

[52] R. Doc. No. 77, at 2.

[53] Furthermore, defendants have never alleged that they had an attorney-client relationship with Rodgers—only that he was the law partner and colleague of their former attorney, Jazayerli. R. Doc. No. 68-1, at 16 (explaining that defendants were "the clients of [Rodgers'] colleague Jazayerli and his own firm"); R. Doc. No. 68-1, at 32 ("The Indictment reads like Jazayerli's civil complaint and relies entirely on information that Jazayerli and Plaintiffs' Counsel gained from *her* [i.e., Jazayerli's] representation of Defendants.").

[54] R. Doc. No. 74, at 6.

transactions.[55]  The government also alleges that it met with members of USCIS as well as NOR's investors.[56]  The government asserts that it obtained waivers from some of the investors, thereby permitting the government to subpoena their attorneys for their client files; some of these investors were represented by Jazayerli.[57]  The government subpoenaed Jazayerli for her investor clients' files, specifically instructing her to include only non-privileged documents and providing the waivers from each of her clients.[58]  The government further asserts that any documents disclosed by Jazayerli, as well as other potentially privileged documents from former employees or consultants, were reviewed for privilege by a taint team, consisting of Assistant U.S. Attorneys that were not part of the prosecution team in this matter.[59]

Nevertheless, to the extent that Rodgers, Jazayerli, Fantaci or other attorneys or persons may have turned over confidential information,

> [t]he fact that the [former attorney's] disclosures might have encouraged the [government] to continue its investigation of [defendants] and, ultimately, to seek an indictment does not justify dismissing the indictment. The

---

[55] *Id.*; *see* R. Doc. No. 68-1, at 25 & note 85.

[56] R. Doc. No. 74, at 6.

[57] *Id.*, at 6–7.

[58] R. Doc. No. 74-8.

[59] R. Doc. No. 74, at 7. Defendants do not dispute that a taint team had been established, but argue that it was not established early enough in the investigation to avoid tainting the investigation. R. Doc. No. 68-1, at 39. Correspondence between the government's taint team and defendants' counsel, attached as exhibits to the government's motion, R. Doc. Nos. 74-16–74-22, reveals, in part, the government's taint team procedures. Specifically, emails provided to defendants' counsel reveals that a taint team had likely been established by November 2015. *See* R. Doc. No. 74-19 (email from Assistant U.S. Attorney Matt Payne ("Payne") instructing special agent Sarah Di Lallo ("Di Lallo") to cease review of documents and turn over all documents to the taint team after Di Lallo notified Payne that the documents may contain privileged communications).

prejudice related only to the investigatory stage and does not affect [defendants'] ability to defend [themselves] at trial. There is a fundamental distinction between the use of privileged information at trial, and its use during the investigatory period. . . . We conclude that the inducement of a violation of an ethical obligation of confidentiality, which encourages the Government to continue an investigation, does not warrant dismissal of an indictment that results from that investigation.

*Rogers*, 751 F.2d at 1079 (citing *United States v. Calandra*, 414 U.S. 338, 349 (1974)).

The government misconduct alleged by defendants' occurred during the investigatory stage and before an indictment was issued. Similar to the defendant in *Rogers*, the government met with Rodgers approximately five years before defendants were indicted, and the government met with Fantaci, for the first time, about three years before defendants were indicted and again just before the return of the indictment.[60] The subpoena issued to Jazayerli was issued on June 8, 2016, approximately two years before the return of the indictment.[61] Moreover, the alleged disclosure of confidential information by defendants' former attorneys would not equate to an intrusion into the attorney-client relationship constituting outrageous government conduct.[62]

---

[60] The government's contact with Mrs. Milbrath's attorney occurred after defendants were indicted, but defendants do not allege that the government sought to obtain information from Mrs. Milbrath's attorney. R. Doc. No. 68-1, at 20–21. They allege that the purpose of the meeting was to offer defendant Milbrath a plea deal. *Id.* Regardless, defendants do not allege that they had an attorney-client relationship with Mrs. Milbrath's attorney.

[61] R. Doc. No. 74-8.

[62] "The fact that [a former attorney] failed to assert the ethical obligation does not transform [the government's] investigation into governmental misconduct." *Rogers*, 751 F.2d at 1080

Moreover, the government demonstrated "sensitivity to potential ethical problems" by instructing Fantaci at both meetings not to reveal privileged information and by subpoenaing documents from Fantaci only in his capacity as a member of the FAB.[63] *See Voigt, supra*, 89 F.3d at 1069. The government similarly instructed Jazayerli to include only non-privileged documents when responding to the subpoena.[64] Furthermore, the government established a taint team to review privileged documents, and when defendants disclosed their own privileged information—which allegedly included communications with attorneys closely associated with NOR—the government alerted defendants to the possible inadvertent disclosures, allowing defendants the opportunity to reclaim the privileged documents.[65]

---

[63] Generally, the Department of Justice requires authorization by the criminal division before a subpoena may be issued to an attorney for information relating to the representation of clients "[b]ecause of potential effects upon an attorney-client relationship." U.S. DEP'T OF JUSTICE, JUSTICE MANUAL, 9-13.410A (2018). However, such authorization is not required as to a "subpoena seeking corporate business information, and which is directed to an attorney who serves as a corporate officer. To make clear that the attorney is being subpoenaed in his/her capacity as a corporate officer, and that no attorney-client information is being sought, the subpoena should be addressed to 'John Doe, in his capacity as secretary of the XYZ Corporation.'" *Id.* Such actions were taken here. R. Doc. No. 74-11, at 3.

[64] R. Doc. No. 74-8, at 2.

[65] The government asks the Court to find that, to the extent the government engaged in any improper conduct, defendants have waived this argument by disclosing privileged information to the government. R. Doc. No. 74, at 24. Regardless, to the extent that defendants did waive their privilege as to those documents or their subject matter, a finding this Court need not make, the Court will not construe such waiver as a waiver of the claims asserted by defendants.

Finally, defendants have not demonstrated that they have been actually prejudiced by the government's actions in this case. Relying on *Marshank*, defendants allege broadly that the government has

> used evidence gained by their interference with Defendants' client confidentiality; has investigated Defendants using information received from their own attorney; it has destroyed Defendants' attorney-client relationship with Fantaci; it has used confidential information that Defendants would use for defense plans and strategy; it has coordinated with Plaintiffs' counsel (*Defendants'* former counsel) in the prosecution of Defendants; it has colluded with Defendants' former attorneys to obtain an indictment against Defendants; it has "show[n] a complete lack of respect for the constitutional rights of" Defendants and "an utter disregard for [its] ethical obligations"; it has availed itself of every unethical tactic to give itself an unfair advantage at trial. *See Marshank*, 777 F. Supp. at 1521, 1524.[66]

Again, the Court finds that the prejudice described in *Marshank* is not present here because there is no allegation or evidence that the government colluded with or intruded on defendants' relationship with their current criminal defense attorneys.

Furthermore, defendants have not identified any privileged information in the government's possession that the government extracted from defendants' former attorneys or that resulted from a forced disclosure. Defendants' bald-faced allegation—that "[i]t is simply impossible that [ ] Rodgers did not disclose client confidences during" the FBI interview because he was able to provide them with information about the EB-5 program and other information included in the civil complaint—is not sufficient to demonstrate prejudice warranting dismissal of the

---

[66] R. Doc. No. 68-1, at 36.

superseding indictment.[67]    Similarly, defendants broad allegation that the government is in possession of non-specific confidential information that defendants *would use* in their defense strategy does not equate to prejudice caused by governmental intrusion into their attorney-client relationships.[68]

"If any privileged information was disclosed to the government in this case, it concerned the workings of [NOR], not [defendants'] legal strategy in responding to the criminal investigation into [their] activities." *Voigt*, 89 F.3d at 1071.  And as the court explained in *Rogers*, to the extent the government obtained information from defendants' former attorneys that furthered its investigation, an ethical violation by defendants' former attorneys does not warrant dismissal of the indictment or constitute outrageous government misconduct.

Having reviewed the totality of the circumstances presented, defendants have not met their burden of showing purposeful and outrageous government misconduct. Even if the government made mistakes in its investigation, a finding this Court does not make, "the government's mistakes here did not reach an abhorrent level." *Swenson*, 894 F.3d at 685.

## B.

Additionally, defendants have not been deprived of their Sixth Amendment right to counsel.  "Depending on when it occurs, government misconduct which subverts a defendant's relationship with his [attorney] may be judged under

---

[67] R. Doc. No. 77, at 3.
[68] R. Doc. No. 68-1, at 36.

standards of both Fifth and Sixth Amendments." *Marshank*, 777 F. Supp. at 1518.

However,

> this is not a case in which the defendant[s'] sixth amendment right to counsel is involved. [The attorney] was not an attorney who was in the process of representing [the defendants] in defending against a criminal charge; [the attorney] was, instead, a potential witness because of a past representation. Thus, cases in which a Government agent or Government informers violated a constitutional right of a defendant by interfering with the attorney-client relationship in the course of a criminal defense are not applicable. Here, we have only a situation in which a potential witness, who was an attorney, talked to federal agents about a past representation of a client; this, at most, involved a breach of the attorney's ethical obligation of confidentiality.

*Rogers*, 751 F.2d at 1077–78. Defendants assert that the government interfered with their relationships with attorneys who represented them in the creation or maintenance of the EB-5 program, NOR, the Fund, and other related entities. Defendants have not alleged government interference in connection with their attorney-client relationships with their criminal defense attorneys. Defendants' argument as to the Sixth Amendment right to counsel fails.

## IV.

Defendants request an evidentiary hearing "to establish the depth and breadth" of the breach of confidentiality.[69] "Although Rule 12 [of the Federal Rules of Criminal Procedure] does not by its terms specify when [a pretrial] motion entitles a defendant to a pretrial evidentiary hearing, [the U.S. Third Circuit Court of

---

[69] R. Doc. No. 68-1, at 26.

Appeals] has held that a defendant's moving papers must demonstrate a 'colorable claim' for relief." *Voigt*, 89 F.3d at 1067. "In order to be 'colorable,' a defendant's motion must consist of more than mere bald-faced allegations of misconduct." *Id.* (citing *United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir. 1990) ("A district court does not have to hold an evidentiary hearing just because a party asks for one. An evidentiary hearing is necessary only if the party requesting the hearing raises a significant, disputed factual issue.")). "There must be issues of fact material to the resolution of defendant's constitutional claim." *Id.* (citing *United States v. Panitz*, 907 F.2d 1267, 1273–74 (1st Cir. 1990)).

> [I]n order to raise a colorable claim of outrageousness pertaining to alleged governmental intrusion into the attorney-client relationship, the defendant's submissions must demonstrate an issue of fact as to each of the three following elements: (1) the government's objective awareness of an ongoing, personal attorney-client relationship between its informant and the defendant; (2) deliberate intrusion into that relationship; and (3) actual and substantial prejudice.

*Id.* (citations omitted); *see also United States v. Hsia*, 81 F. Supp. 2d 7, 19 (D.D.C. 2000). Defendants have not raised a colorable claim for relief. While the parties disagree as to the weight the Court should give to the available facts, the Court does not find a significant factual dispute that would warrant an evidentiary hearing.

The government could only have had an objective awareness of an ongoing attorney-client relationship between Fantaci and defendants, as Fantaci is the only attorney with whom defendants allege they had an ongoing attorney-client

relationship at the time he met with the government.[70]  However, to the extent that defendants had an ongoing personal attorney-client relationship with Fantaci, or even with Rodgers through Jazayerli and Dilworth Paxon, defendants have not shown that the government deliberately intruded into those relationships.[71]

The court in *Voigt* found no intrusion into the attorney-client relationship by the government, in part, because the attorney's contact was "unsolicited." *Voigt*, 89 F.3d at 1070.  Rodgers similarly contacted the government voluntarily to report defendants' alleged fraud, and there is no allegation of continued contact or additional meetings with Rodgers.  The court in *Voigt* also found no intrusion into the attorney-client relationship because the government demonstrated "sensitivity to potential ethical problems." *Id.* at 1069.  In both meetings with Fantaci, the government sought to protect potential privileged information and specifically noted in its subpoena for documents that the government was "not request[ing] the contents of any privileged attorney-client communications."[72]

---

[70] R. Doc. No. 68-1, at 35. Defendants do not allege that they had an "ongoing personal, attorney-client relationship" with Rodgers, specifically stating that defendants were the clients of Rodgers' "colleague Jazayerli and his own firm." *Id.* at 16.  Furthermore, defendants so not allege an attorney-client relationship with Berez or Mrs. Milbrath's attorney. Berez was not an attorney at all, but instead was the EB-5 program director.

[71] The Court underscores the fact that the only cases defendants cite in support of their motion to dismiss, and to support their claim that the government intruded on their attorney-client relationships, involve alleged intrusions into the defendants' relationships with their criminal defense attorneys in ongoing criminal matters, *Marshank*, 777 F. Supp at 1523, *Voigt*, 89 F.3d at 1063, or where the defendants' criminal defense attorneys became government agents and prosecuted them in the same criminal matter. *Schell*, 775 F.2d at 566.  Those facts are not present here.

[72] R. Doc. Nos. 74-9, 74-10, 74-11, at 3.

Finally, as discussed above, defendants have not demonstrated prejudice from any of the alleged confidential disclosures or intrusions. Unlike the government misconduct in *Schell* and *Marshank*, there is no evidence or assertion that the government, in an effort to obtain the disclosure of confidential information, directed defendants' actions or colluded with defendants' counsel. If any improper disclosures did occur, they "can be neutralized by the exclusion of improperly obtained evidence at trial." *Rogers*, 751 F.2d at 1079.

**V.**

For the reasons assigned,

**IT IS ORDERED** that the motion to dismiss the superseding indictment is **DENIED**.

New Orleans, Louisiana, April 29, 2019.

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**
